UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| NASSAU MARITIME HOLDINGS DESIGNATED ACTIVITY COMPANY | * * * | CASE NO. 2:20-cv-00355 |
| VERSUS | * * | JUDGE JAMES D. CAIN, JR. |
| M/V PACIFIC SKY, her engines, tackle, appurtenances, etc., *in rem,* and PACIFIC SKY NAVIGATION LTD, *in personam* | * * * * * | MAGISTRATE JUDGE KAY |

*************************************************

## DECLARATION OF MEHMET ALI UMUR

Mehmet Ali Umur hereby declares under penalty of perjury as follows:

1.       I am currently, and was at all times material to this litigation, the sole owner of

Pacific Sky Navigation Ltd. ("Pacific Sky"), with a professional address at İmes Sanayi Sitesi, A

Blok, 105. Sokak, No: 3, Dudullu Organize Sanayi Bölgesi, Ümraniye, İstanbul, Turkey 34775. I

have personal knowledge of all facts set forth herein.

2.       At all times material to this litigation, Pacific Sky was, and currently is, the owner

of the M/T PACIFIC SKY.

3.       In this litigation, Nassau Maritime Holdings Designated Activity Company

("Nassau Maritime") makes a claim under a loan for the amount of $119,366,178.14 in principal

and $4,867,472.32 in interest. The M/T PACIFIC SKY is one of five (5) vessels financed under

the loan, and the fourth one which has now been arrested. Nassau Maritime has also arrested

vessels covered by the same loan and under the same management as the M/T PACIFIC SKY in

Saldanha Bay, South Africa, Labuan, Malaysia, and Zhoushan, China.

1



4.      Pacific Sky disputes that Nassau Maritime has any valid claim under the loan agreement, but the principal amount owed under the loan agreement solely for the M/T PACIFIC SKY, if any, would be the balloon payment amount of $17,642,090, which Pacific Sky would have refinanced (it had a signed term sheet with Australis) had the lenders complied with their duties under German law to act in good faith toward Pacific Sky.

5.      Pacific Sky estimates that the current market value of the M/T PACIFIC SKY is approximately US$20 - 24 million. However, the global economy is beginning to improve, and I believe in line with this improvement the market value of the vessel will increase in the foreseeable future.

6.      Pacific Sky is in the process and has been in the process of trying to obtain financing to get the M/T PACIFIC SKY and the other vessels released since the first day of the arrest on 3 April 2020.

7.      Pacific Sky has been talking to surety companies in the United States, including International Sureties in New Orleans and Pedersens & Sons in New York, as well as some well-known and reputable global banks, especially in Europe, in this regard and exploring what shape or form the securities could be provided by each.

8.      Pacific Sky believes in good faith that there is a good chance it will be able to post security through these surety companies as soon as its latest financial results are provided. Although Pacific Sky is working hard in searching for different sources of funds in order to be able to come up with security, the uncertainties around the COVID-19 pandemic have made the search more difficult. First, to provide adequate security for the fair market value is a challenge in today's environment with the nominal amount needed being rather high for anyone. In addition, because of the pandemic-related lockdowns, our offices have been closed for an

2

extended amount of time, as have counterparts we have been in contact with around the world. As an example, surety companies have asked for certain audited financials from our group; however, our auditor KPMG has not yet been able to supply these to us due to restricted time they have been able to allocate to our project amid the COVID pandemic. Finally, the pandemic-related travel restrictions in place make it very difficult for our representatives to move quickly.

9.     In this litigation, Nassau Maritime claims that the talks between the parties have ended "without any real progress being made" whereas Pacific Sky and the other vessel owning companies have made a very serious offer for a global settlement on a without-prejudice basis with the understanding that a commercial solution would be more beneficial to both parties than a legal one. We are waiting for Nassau Maritime to respond to our offer for a global settlement.

10.     Nassau Maritime's claim that it has incurred more than $365,000 in *custodia legis* expenses in this litigation is misleading, because those expenses include about $200,000 for 1000 tons of VLSFO supplied to the M/T PACIFIC SKY by Nassau Maritime on or around 27 April 2020 that was not needed as the same cannot be burned in U.S. territorial waters, the vessel already had more than 900 tons of VLSFO onboard, and the MGO supply (of 300 tons) would have sufficed for maintaining the vessel while under arrest. The bunkering of the VLSFO has been done despite warnings on our side that there was no need for the same whilst the vessel is under arrest.

11.     Because Nassau Maritime bunkered the M/T PACIFIC SKY with VLSFO that cannot be burned in U.S. territorial waters, tanks that were free and could have been cleaned for the needed MGO are now filled with VLSFO, limiting the amount of MGO onboard to 300 tons. Pacific Sky questions why Nassau Maritime loaded the 1000 tons of VLSFO, as it was not needed.

12.     Pacific Sky disputes Nassau Maritime's right to enforce the mortgage for the reasons explained in the Declaration of Dr. Ulrich Stahl, and Pacific Sky and the other vessel owning companies have sustained substantial losses in terms of lost income opportunities due to the wrongful vessel arrests in this jurisdiction and in South Africa, Malaysia and China.

13.     The M/T PACIFIC SKY has a full crew onboard the vessel performing all the necessary maintenance required to make sure the vessel remains in good condition.

14.     The crew on board the M/T PACIFIC SKY is experienced facing various weather conditions and maritime perils, and the Vessel can be moved to a safe berth inland if the threat of a hurricane becomes a reality.

15.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __02__ June 2020, in Istanbul, Turkey.

_____
Mehmet Ali Umur

4826-6422-2494, v. 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| NASSAU MARITIME HOLDINGS | * | CASE NO. 2:20-cv-00355 |
| DESIGNATED ACTIVITY COMPANY | * | |
| | | * |
| VERSUS | * | JUDGE JAMES D. CAIN, JR. |
| | | * |
| M/V PACIFIC SKY, her engines, tackle, | * | MAGISTRATE JUDGE KAY |
| appurtenances, etc., *in rem,* and | * | |
| PACIFIC SKY NAVIGATION LTD, | * | |
| *in personam* | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DECLARATION OF DR. ULRICH H. STAHL

Dr. Ulrich H. Stahl, LL.B. (Cantab.) hereby declares under penalty of perjury as follows:

1.    I am a qualified attorney admitted to practice law in Germany since 1987, and a partner at the law firm of LEBUHN & PUCHTA, Hamburg, Germany.

2.    I am an expert on German law and appear from time to time before foreign courts as an expert on German legal issues. My qualifications, experience and expertise are described in my curriculum vitae, a copy of which is annexed hereto marked "Exhibit A".

3.    I have been asked to render an opinion on the impact under German law of the contentions of Plaintiff, Nassau Maritime Holdings Designated Activity Company, that all rights and obligations arising from the Loan Agreement dated 15 May 2008 (the "Loan Agreement" or the "LA") were lawfully transferred to the Plaintiff in consideration of the Loan Assignment Agreement dated 21 June 2019 (the "LAA").

### A.    Factual Background

4.    My opinion is based on the following understanding of the facts related to me by my clients, amongst which there are the Defendants.

1



5.   By the Loan Agreement between Hamburg Commercial Bank (then called HSH Nordbank AG) (the "Bank") and seven borrowers being Fair Seas Navigation Ltd., Nordic Bay Navigation Ltd., Pacific Sky Navigation Ltd., Lambert Navigation Ltd., Northville Navigation Ltd., Providence Navigation Ltd. and Spencer Navigation Ltd. (the "Borrowers"), the Bank agreed to provide construction and long-term finance to the Borrowers in the total amount of around USD 418,441,800 (the "Loan").

6.   Seven (7) vessels, including the M/T PACIFIC SKY, were financed under the Loan Agreement and entered into service following their delivery as new builds.

7.   The Bank purportedly sold the Loan to Promontoria Maritime Holdings Designated Activity Company ("Promontoria") through a Loan Sale and Purchase Agreement dated 28 February 2018 without disclosing same to the Borrowers. Promontoria is a hedge fund vehicle controlled by the Bank's then designated new shareholder Cerberus.

8.   In a signed letter dated 10 September 2018 the Bank wrote to the Borrowers, including the Defendant, indicating that it would give at least three months' notice – prior to the due date for the balloon payment relating to the M/T PACIFIC SKY – to demand a cure of a loan-to-value ratio ("LTV") shortfall as a condition for consenting to releasing its mortgage over the vessel. The LTV shortfall had come about as a result of the 2008 international financial crisis . The shortfall had since then been subsisting for more than 10 years, without the Bank ever having called a default under the LA in relation to it. The due date for the balloon payment relating to the M/T PACIFIC SKY was to be 5 March 2019. Therefore, any such notice giving the Defendant warning of the Bank's intention to now wishing to change its mind and act upon the LTV shortfall, would have had to be sent to the Defendants latest on or about 5 December 2018. In the event, no notice of this kind was received from the Bank by the Defendants.

9.   During December 2018 as well as January and February 2019 the Borrowers were trying to persuade the Bank to look at, and eventually agree on, an extensions to the LA. The Bank, by contrast took its time to consider this request. Whatever the Bank's true intentions were during this period of time, they were not revealed to the Borrowers just then.

10. By 14 February 2019 the Defendants had successfully procured from a third party financier ("Australis") alternative finance which would have enabled them to pay the balloon on the M/T PACIFIC SKY as and when it would fall due on 5 March 2019.  To that end, the Borrowers on 14 February 2019 counter-signed a detailed Term Sheet agreed to by Australis.

11. Beginning as from around 18 February 2019 the Bank unequivocally represented to the Borrowers, including the Defendants, that it desired the LA to be terminated early and offered to negotiate, by way of commercial incentive to the Borrowers, a discount on all amounts which would be outstanding under the LA upon their respective maturity dates.

12. In relying on the Bank's initiative and representations as aforesaid, the Defendants placed finalization of the alternative finance for the balloon payment pertaining to the M/T PACIFIC SKY with Australis on hold and instead fully concentrated on the negotiations the Bank had requested.

13. Despite the foregoing, the Bank on 6 March 2019 (i.e. the day after the balloon for M/T PACIFIC SKY had fallen due for payment) called a default under the LA in respect thereof.

14. On 21 June 2019, the Bank purported to assign and transfer all rights and obligations arising from the Loan Agreement to Promontoria through the LAA.

15. In January 2020, Promontoria changed its name to Nassau Maritime Holdings Designated Activity Company ("Nassau Maritime") in conjunction with a transfer of control in Promontoria from Cerberus to Fortress and Cross Ocean Partners, also hedge funds.

16. In the present proceedings, Plaintiff is asserting that it has acquired the Loan from the Bank, that all rights and obligations arising from the Loan Agreement were lawfully transferred to it in consideration of the LAA, and that it has the right to exercise the rights of the Bank under the Loan Agreement. This legal notion is not correct for the following reasons.

**B.**   **No valid transfer of rights to Plaintiff occurred regarding the**

**Loan Agreement dated 15 May 2008 due to section 399 of the German Civil Code**

17.   The LA is governed by German law as set forth in clause 22 of the LA.

18.   In general, as per sections 398 *et seq.* of the German Civil Code ("BGB"), claims are assignable under German law. However, there are several exceptions to this rule. The two exceptions immediately relevant are those set forth in section 399 BGB, which reads as follows:

> *A claim may not be assigned if performance cannot be made to a person other than the original creditor without a change of its contents or if the assignment is excluded by agreement with the debtor.*

19.   In the instant case, both alternatives of the provision are applicable. Therefore, there was no valid transfer of rights based on the LAA so that the Nassau Maritime was not entitled to arrest the vessel in dispute.

a)   **Implied exclusion of assignment as per clause 21 of the LA in conjunction with section 399 alt. 2 of the German Civil Code**

aa)   Focusing on section 399 alt. 2 BGB ("...*if the assignment is excluded by agreement with the debtor*"), clause 21 of the LA stipulates the extent to which it is possible to assign claims arising thereunder. Although clause 21 of the LA does not provide an explicit exclusion of the assignment of claims, as regards the Lender as creditor, the parties impliedly agreed on such an exclusion, which is possible, according to jurisprudence of the German Federal Supreme Court (hereinafter "BGH").[1]

bb)   Taking into consideration the circumstances, the parties to the LA impliedly agreed on an exclusion of the transfer of rights as regards the Lender unless the exemption of "Syndication" applies.

---

[1] See BGH, judgement dated 26 June 2002 – VIII ZR 327/00.

cc)   Clause 21.2 of the LA refers to the possibility of the transfer of rights and obligations on behalf of the Lender in the event of a "Syndication". This provision expressly stipulates that the Lender shall be entitled to assign its rights under the LA in the context of a Syndication.

dd)   In the instant case, no such syndicate was in fact formed. Quite to the contrary, the Plaintiff, respectively Promontoria North Shipping Designated Activity Company as the "Original Assignee" intended to acquire "the full contractual position" as set out in the LAA.[2] Hence, the parties to the Loan Sale and Purchase Agreement dated 28 February 2018 and to the LAA did not intend to form a joint syndicate, the parties rather intended to effect a replacement of the Hamburg Commercial Bank AG ("HCoB", formerly known as the HSH Nordbank AG or HSH) as original contract party.

ee)   From clause 21.2 of the LA, it must be inferred that it was the parties` intention to agree *solely* on the possibility of a transfer of rights regarding the Lender in the context of Syndication but not otherwise. For that reason, I conclude that the parties to the LA in fact agreed on a comprehensive exclusion of the assignability of any rights, outside the parameters of syndication within the detailed meaning of said clause. Since a syndicate was not formed, the intended transfer, which the LAA purported to give effect to, was not effective to transfer the subject claims from HCoB to the Plaintiff. The transfer was, I submit, invalid under German law.

b)   **Exclusion of assignment of rights under the LA as per section 399 alt. 1 BGB due to the person-related nature of the claims**

aa)   According to section 399 alt. 1 BGB ("A claim may not be assigned if performance cannot be made to a person other than the original creditor without a change of its contents…"), rights under a contractual agreement are not assignable if the transfer would result in a change of the contents of these rights.

---

[2] See paragraph (D) under the heading "BACKGROUND" on the first page of the LAA.

5

Regarding loan agreements, there is case law to the effect that a loan cannot be transferred if repayment of the loan is tied to the person of the lender.[3] This rule applies in the case at hand due to the following reasons.

bb)   Mr. Ali Umur controls the Defendant. He has been engaged in the business of shipping through the Istanbul-based Active Shipping Group – which he also controls – since 1993 and since this point in time there has been banking relationship between Mr. Umur and the Bank. Hence, when the LA was concluded in 2008, Mr, Umur had already been a customer of the Bank for about 15 years. Over the course of his banking relationship with the Bank which lasted for around 25 years until 2019, Mr. Umur financed around 13 vessels with the Bank under loans totalling around USD 750 million. Mr. Umur's credit volume with the Bank reached approximately USD 500 million at its high point. Mr. Umur was a valued customer of the Bank. Mr. Umur has not missed a single interest or amortization payment throughout his working relationship with the Bank until 2019.

cc)   Therefore, as the LA was concluded, the parties entered into this agreement based on the successful and trustful banking relationship that has been established over the past 15 years. This is a crucial aspect since the LA was concluded when the 2008/09 financial crisis had already taken up pace. That is, the LA was concluded despite the uncertain outlook but Mr. Umur decided to take this risk due to the trust-based relationship with the Bank and, what is more, even guaranteed the full amount of the loan by way of a personal guarantee. And the Bank did not regret its commitment since Mr Umur managed to repay its debts even in the peak time of the financial crisis, irrespective of the devastating conditions in the shipping market back then. These circumstances strengthened the trustworthy relationship even more. Consequently, it was of utmost importance to Mr. Umur that the Bank remained the contracting party to the LA because it is obvious that a contractual partner with whom no long-lasting

---

[3] See Higher Regional Court of Cologne, judgment dated 28th April 1999 – 13 U 199/98.

business relationship was established over several years would act differently than a contracting party that honours and appreciates the reliable business conduct of its borrower.

dd) In consideration of the reasons above, the loan repayment claim was person-related. Consequently, the Bank was barred from assigning it to the Plaintiff as per section 399 alt. 1 BGB.

c) **All remaining ambiguity, if any, in construing clause 21.2 LA would be resolved against the Bank (applying the "*contra proferentem rule*")**

Clause 21.2. LA at all material times was part of the Bank's standard wording in any ship finance loan agreement it would enter into. Contents of the Clause are repeated, in a wording virtually identical to that appearing in Clause 21.2 LA itself, in the Bank's 2006 General Business Conditions (clause 29, "Syndication") which came to be annexed and were made to form part of the main body of the LA. The Bank insisted on Clause 21.2 to be expressly included in the main body of the LA. In these circumstances and applying well established principles of German contract law as regards general business terms and conditions, any remaining ambiguity in Clause 21.2 LA, as regards its operation to oust, by mutual consent, the general rule of claims being normally freely assignable, would be resolved against the Bank. Any German court seized with the issue would resolve the issue of construction in favour of the Defendant. It would in my opinion hold that, on the wording of the clause itself and having due regard to the state of German law and the circumstances prevailing at the time the LA came to be entered into, the Bank would be deemed to have tacitly given its consent to a contractual position under the LA whereby no claims, save for the context of syndication as described, must be assigned by the Bank without the Defendant borrower's consent.

### C.     No valid transfer of rights was made to Plaintiff

### regarding the Loan Agreement due to the invalidity of the LSPA

20.   Based on the documents provided to me to date, there are several indications that the intended transfer of rights under the LAA was invalid due to the ineffectiveness of the Loan Sale and Purchase Agreement dated 28 February 2018 (the "LSPA"). However, since the request for the disclosure of the LSPA and the other related documents has not been met yet in any way that might be regarded as satisfactory, I am merely in the position to provide a preliminary assessment based on the facts known to me at this time.

21.   Under German law, the validity of a contract concerning the law of obligations (*e.g.*, a sales contract) is independent from the validity of the respective material transfer agreement (*e.g.*, the transfer of the ownership of the sold objects or rights). In the case at hand, the LSPA appears to be the contract concerning the law of obligations (i.e. the agreement designed to transfer the loan) and the LAA is the respective material transfer agreement (i.e. meant to bring about the actual transfer). Therefore, in general, the invalidity of the LSPA would not affect the effectiveness of the LAA. As a rule, the two tend to stand independently from one another.

22.   However, there are exemptions to the aforementioned under German law. The parties to a contract are entitled to connect the contract concerning the law of obligations and the transfer agreement to form, together, a business unit in the meaning of section 139 BGB with the consequence that an invalid contract concerning the law of obligations would render the transfer agreement void.[4]

23.   In addition, under German law, the parties may agree explicitly or impliedly that the validity of the transfer agreement is to be contingent upon the validity of the contract concerning the law of obligations.[5]

---

[4] See *Lieder*, in: beck-online.GROSSKOMMENTAR, edition: 1st March 2020, § 398 recital 84.
[5] See *Lieder*, in: beck-online.GROSSKOMMENTAR, edition: 1st March 2020, § 398 recital 83.

8

24. With regard to both exemptions, the will of the parties is usually held to reign supreme. Any German court seized with an issue of construction on a point like this would normally take into consideration the material circumstances of the individual case.

25. Although the provisions of the LSPA are not known to me at this time, there are severe indications which lead me to conclude that the LSPA is null and void. The invalidity would arise out of the intent of the parties in paragraph (D) under the heading "BACKGROUND" on the first page of the LAA to transfer the full contractual position of the HSH Nordbank AG under the LA to the Plaintiff. Hence, it was intended by the parties that the Plaintiff becomes the contract party to the Defendant under the LA instead of the HSH Nordbank AG.

26. However, under German law, the validity of such an exchange of a contracting party is dependent on the consent of the other contracting party.[6] The Defendant has not declared its consent to the intended exchange. Hence, the Plaintiff has not become the contractual partner of the Defendant under the LA.

    a) As a result, I believe that the LSPA is to be deemed invalid.

    b) As discussed above, the invalidity of a contract concerning the law of obligations (here: the LSPA) may affect the validity of the material transfer agreement (here: the LAA) in the event that one or more of the said exemptions apply. I believe that this is the case here. In this regard, the purpose underlying conclusion of the LSPA is in my opinion decisive.

27. In the course of the sale of the shares of the HSH Nordbank AG in the context of privatisation, which was inevitable due to compulsory specification of the European Union, the conclusion of the LSPA was principally driven by the desire of HSH to off-load from the HSH balance sheet 2017 EUR 3,5 Billion worth of shipping (and real estate) portfolio (the so-called "carve-out-portfolio"). The LA appears to have been part of this carve-out-portfolio. The revaluation of the balance sheet, however, required that HSH would cease to be a party to the respective loan agreements. Hence, the overall objective of HSH would not

---

[6] See *Binder*, in: beck-online.GROSSKOMMENTAR, edition: 15th February 2020, § 488 recital 89.

have been accomplished if merely the loan repayment claim as such would have been assigned to the Defendant. Rather, it was indispensable for the HSH to exit from the LA completely. Otherwise, the transaction would not have fulfilled its purpose, namely to off-load substantial debt from the Bank's balance sheet for 2017 and going forward.

28.   Taking into consideration the aforementioned circumstances, it has to be presumed, I submit conclusively, that the parties intended to tie the validity of the LAA to the effectiveness of the LSPA.  Otherwise one would have to conclude that, whilst the HSH would have sold the LA at a significant discount, it would not have thereby been able to accomplish its overall objective, namely: the revaluation of its balance sheet.

29.   For these reasons, there are strong indications that the transfer of rights under the LAA was invalid due to the ineffectiveness of the LSPA.

30.   Of course, as I have stated above, this my analysis as presented above would need, of necessity, to remain subject to review once full and proper discovery has been given by the Plaintiff in these or any related proceedings, particularly with regard to the LSPA.

### D.     The Bank's duty to have due regard to the interests of the Borrowers

31.   As a matter of German law under § 241 (2) BGB, depending on the nature and terms of the relationship in question, any contract may bind the parties to consider the other side's rights, legal assets and other interests. A party to a contract is thus under a general duty to exercise reasonable care and attention so as to avoid inflicting uncalled-for loss and detriment to the position of his contractual partner. A breach of these so-called "ancillary duties" may result in a right to damages in favour of the other party.

32.   Under German law, the contractual relationship between a bank and its client is recognised as one which is fundamentally characterised by trust. When a bank's client places funds, assets and, not least of all, usually also a wealth of personal data into the hands of the bank, the client is to a large extent dependent on the bank's exercise of due care and on the bank acting in good faith in relation to all of these.

10

33.  Under German law, in the relationship between a bank and its client, the bank owes ancillary duties to its client pursuant to § 241 (2) BGB. Ancillary duties, as any other contractual duty under German law, are to be performed in good faith as set out in § 242 BGB.

34.  It follows that, by virtue of the contractual relationship, the Bank was under a duty to pay due regard to the Borrowers' rights and interests when acting in relation to the Loan Agreement.

35.  Misrepresentation, even if it is only negligent (rather than wilful), and the failure to inform a contract partner of facts that he could reasonably expect to be informed about, constitute typical examples of a breach of ancillary duties, the legal remedy for which under German law typically sounds in damages.

36.  The Bank in its letter of 10 September 2018 indicated that it would give at least three months' notice – prior to the due date for the balloon relating to the MT PACIFIC SKY – to demand a cure of a loan-to-value ratio ("LTV") shortfall as a condition for consenting to releasing its mortgage over the vessel. The Bank never gave any such notice.

37.  Accordingly, the Borrowers were legally entitled to sell the M/T PACIFIC SKY, in accordance with clauses 7.7 and 7.8 of the Loan Agreement, provided they repaid the balloon on time and/or prior to any entitlement of the Bank to act on an LTV issue. The amount of the balloon was around USD 17.6 million. In view of the size of the balloon, the Borrowers would obviously seek to refinance the vessel elsewhere if the Bank did not extend the Loan, which means that in the context of a refinance, the Bank was under a duty to discharge its mortgage to enable a sale and refinancing free from encumbrances.

38.  By reason of the said ancillary duties owed by the Bank, namely the duty to maintain all requisite standard of conduct which accords with the special relationship of trust inherent in the banking relationship and to act in good faith in the context of the contractual relationship, the Bank was duty-bound, generally, to respect the Borrowers' rights and, more particularly, to abstain from making any representations or promises that it had no intention of keeping. The Bank acted in disregard of  its contractual duties in misleading the Borrowers as to their

11

true intentions regarding the LA, thereby causing the Borrowers to act in a way which was going to be detrimental to their own interests.

39.   In particular, the Bank acted in breach of its ancillary duties through various actions and representations made by the Bank, including, *inter alia*, delaying its response to the Borrowers' request for an extension of the Loan for the M/T PACIFIC SKY, leading the Borrowers to believe that negotiations with the Bank (aiming at an extension to the LA, as desired by the Borrowers) would be carried out in good faith, and failing to disclose to the Borrowers that the Bank had meanwhile already transferred the Loan Agreement, as early as 28 February 2018, to a hedge fund entity.

40.   The Bank's conduct was grossly misleading and lacking in good faith. The Bank knowingly interfered with the Borrowers' possibility to refinance the MT "PACIFIC SKY" on a stand-alone basis; it lured the Borrowers to slip into a default situation instead; it did this in order to leverage its own position and try to force an early termination of the Loan on its own terms. Under German law, this amounts to a breach of the Bank's ancillary duties under the Loan Agreement.

41.   It is apparent that the Borrowers would have taken action in time to safeguard their own position, had they known that the Bank had ceased to maintain any legal or beneficial ownership interest in the Loan. By the same token, the Borrowers were totally unaware that the Bank and/or the unknown hedge fund to whom the Loan had purportedly been transferred intended not to negotiate in good faith,  neither for a contractual extension of the LA (as initially desired by the Borrowers) nor for an early termination by consent (as the Bank held out this to be its own desire and preferred option). Had the Borrowers been informed about this major development that had taken place with regard to their LA, they would have taken all requisite steps necessary to make sure that there would not occur any default under the Loan Agreement, as they have done throughout their 25-year long unbroken history of performance, even in the most difficult market conditions.

42.   By reason of the breach by the Bank of its ancillary duties as aforesaid, the Bank caused the Borrower to (erroneously) rely on the Bank's ostensible readiness to bona fide negotiate for a mutually acceptable extension of the LA, in furtherance of the long established trust-based

commercial relationship between the parties. In the premises and applying German law and highest legal precedent, there lies in German law a well-established legal presumption in favour of the Borrowers that, *but for* the said breach on the part of the Bank, the Borrower would have protected its interests in time and well and would have, thus, avoided default under the LA. As a result, the Borrowers are entitled to damages.

43. Given that the Bank was in continuing breach of its ancillary duties, it follows as a matter of German law that the right of the Bank to terminate the Loan Agreement in fact never arose, neither under the contract nor in law. Accordingly, at the time when Promontoria purported to terminate the Loan Agreement by giving notice of termination on 12 March 2020, no such right could be exercised.

44. To the extent that Promontoria, now Nassau Maritime, is purporting to exercise the Bank's rights following a purported transfer of the Loan Agreement or an assignment of rights (the validity of which is denied), under German law, its position is in any event subject to equities. This means that Nassau Maritime cannot exercise or benefit from rights which the Bank, on account of its own breach of ancillary duties, did not have or, in any event, was not entitled to exercise. As the Bank would not be allowed under German law to benefit from its own wrong, so would Nassau Maritime, as a subsequent (purported) assignee of the Bank's position, be equally considered barred from acquiring and/or exercising that same legal position. Under German law there does not exist any concept as might be called "*bona-fide equity-free acquisition of claims*". Instead, it is an enshrined principle of German law that any assignee ("new creditor") could *only* take an assignment from the assignor ("old creditor") *always subject* to all equities already available to, and accrued to the benefit of, the debtor at the time of assignment (viz. section 404 BGB).

45. Furthermore, the Plaintiff Promotoria (now renamed Nassau Maritime) was at all material times the party truly interested in relation to the LA. Certainly as of the time of closing relating to the LSPA which took place on 28 November 2018, the Plaintiff must have been involved in steering the Borrowers into a default situation. In any event, the Plaintiff must have been fully aware of the dispute between the Bank and the Borrowers as regards the

Bank's conduct under the LA, before entering into the Assignment Agreement dated 21 June 2019.

46.   I declare under penalty of perjury under the laws of the United States of America that the foregoing assessment of the German law issues is true and correct, to the best of my professional knowledge and belief.

Executed on ⸝⸝ June 2020, in Hamburg, Germany.

_____

Dr. Ulrich H. Stahl, LL.B. (Cantab.)

4845-1296-5821, v. 1

14

Exhibit A

## CURRICULUM VITAE

### Dr. Ulrich H. Stahl, LL.B. (Cantab.)

## PROFESSIONAL EXPERIENCE AND CAREER

Dr. Stahl is the senior partner of LEBUHN & PUCHTA, an established maritime law firm in Hamburg, Germany, founded in 1950.

Dr. Stahl joined LEBUHN & PUCHTA in 1987 and became partner of the firm in 1989.

Dr. Stahl's legal practice covers the entire range of commercial litigation, with an emphasis on shipping, international sale, insurance and reinsurance. Dr. Stahl has extensive experience in commercial dispute resolution, including in complex, heavy and high value cases.

Dr. Stahl appears in foreign courts as an expert on German law and also accepts appointments as arbitrator.

Dr. Stahl's clients range from industrial groups to ship owners, charterers, insurance and reinsurance companies.

## LEGAL TRAINING

- Universities of Munich, Göttingen, London and Cambridge (LL.B. 1981) - doctoral thesis in 1987
- Admitted to the German bar in 1987

June 2, 2020