# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **NASSAU MARITIME HOLDINGS** | * | **CASE NO. 2:20-cv-00355** |
| **DESIGNATED ACTIVITY COMPANY** | * | |
| | * | |
| **VERSUS** | * | **JUDGE JAMES D. CAIN, JR.** |
| | * | |
| **M/V PACIFIC SKY, her engines, tackle,** | * | **MAGISTRATE JUDGE KAY** |
| **appurtenances, etc.,** *in rem,* **and** | * | |
| **PACIFIC SKY NAVIGATION LTD,** | * | |
| *in personam* | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## MEMORANDUM IN OPPOSITION TO
## <u>SECOND MOTION FOR INTERLOCUTORY SALE OF VESSEL</u>

Respectfully Submitted,

MURPHY, ROGERS, SLOSS,
  GAMBEL & TOMPKINS

*/s/ Peter B. Sloss*
Peter B. Sloss (#17142)
psloss@mrsnola.com
Donald R. Wing (#29486)
dwing@mrsnola.com
701 Poydras St., Suite 400
New Orleans, LA 70139
Phone: 504.523.0400
Fax:  504.523.5574
***Attorneys for Pacific Sky Navigation Ltd.***

## **Table of Contents**

Table of Contents ............................................................................................. i

Table of Authorities ......................................................................................... ii

Introduction ..................................................................................................... 1

Law and Argument .......................................................................................... 3

   I.   None of the Prerequisites Which Allow an Interlocutory Sale of a Vessel Are Present in This Case ................................................................................. 3

      A.   The Vessel is not perishable, or liable to deterioration, decay, or injury .... 4

      B.   The expense of keeping the Vessel is not excessive or disproportionate when compared to the Vessel's value ........................................................ 5

      C.   There has not been an unreasonable delay in securing the Vessel's release. ............................................................................................................. 8

   II.   Nassau Maritime Should Not be Permitted to Make a Credit Bid on the Vessel ................................................................................................... 11

Conclusion ..................................................................................................... 17

## Table of Authorities

Cases

*Action Marine, Inc. v. M/V NORSEMAN*, 1997 U.S. Dist. LEXIS 5898 (E.D. La. Apr. 28, 1997) ................................................................................................................. 10

*Adams Offshore, Ltd. v. Con-Dive, LLC*, 2010 U.S. Dist. LEXIS 7922 (S.D. Ala. Feb. 1, 2010) . 6

*Bank of Nova Scotia v. St. Croix Hotel Corp.*, 44 B.R. 277 (Bankr. D.V.I. 1984) ................... 15

*Bank of Rio Vista v. Vessel Captain Pete*, 2004 WL 2330704 (N.D. Ca. 2004) ...................... 10

*Boland Marine & Mfg. Co. v. M/V A.G. Navajo*, 2002 U.S. Dist. LEXIS 22737 (E.D. La. Nov. 22, 2002) .................................................................................................................. 10

*Coastal Marine Mgmt. v. M/V Sea Hunter (O.N. 598425)*, 274 F.Supp.3d 6 (D. Mass. 2017) ... 11

*Colonna's Shipyard, Inc. v. U.S.A.F. General Hoyt S. Vandenberg*, 584 F.Supp. 2d 862 (E.D. Va. 2008) ....................................................................................................................... 9

*Crabtree v. The SS Julia*, 290 F.2d 478 (5th Cir. 1961) ....................................................... 14

*E.N. Bisso & Son, Inc. v. M/V Bouchard Girls*, 2020 U.S. Dist. LEXIS 156595 (E.D. La. Aug. 28, 2020) ...................................................................................................................... 11

*Entron, Ltd. v. Crane Vessel Titan 2*, 1995 U.S. Lexis 6005 (E.D. La. 1995) ......................... 10

*Ferrous Financial Services Co. v. O/S ARCTIC PRODUCER*, 567 F.Supp. 400 (W.D. Wa. 1983) ........................................................................................................................ 9

*Gyasi v. M/V "Andre"*, 2008 U.S. Dist. LEXIS 30279 (S.D. Fla. Apr. 1, 2008) ........................ 5

*In re Antaeus Technical Servs., Inc.*, 345 B.R. 556 (Bankr. W.D.Va. 2005) ........................... 15

*In re Daufuskie Island Properties, LLC*, 441 B.R. 60 (Bankr. D.S.C. 2010) ........................... 15

*In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55 (Bankr. D. Del. 2014) .............................. 15, 16

*In re Free Lance-Star Publ'g Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014) ................................ 16

*In re Medical Software Sols.*, 286 B.R. 431 (Bankr. D. Utah 2002) ........................................ 15

*In re Merit Grp., Inc.*, 464 B.R. 240 (Bankr. D.S.C. 2011) .................................................... 15

*Merchants Nat'l Bank of Mobile v. Dredge Gen. G.L. Gillespie,* 663 F.2d 1338 (5th Cir. 1981)  8, 9, 10

*Neptune Orient Lines, Ltd. v. Halla Merchant Marine Co., Ltd.*, 1998 WL 128993 (E.D. La 1998) ........................................................................................................... 9, 14, 15

*Prosperity Bank v. Tom's Marine & Salvage, LLC,* 2020 U.S. Dist. LEXIS 26811 (E.D. La. Feb. 18, 2020)........................................................................................................... 10

*Silver Star Enters. v. M/V Saramacca*, 19 F.3d 1008 (5th Cir. 1994) ..................................... 14

*Triton Container Int'l v. Baltic Shipping Co.*, 1995 U.S. Dist. LEXIS 4856 (E.D. La. Apr. 11, 1995) ............................................................................................................................. 3

*United States v. Approximately 81, 454 Cans of Baby Formula*, 560 F.3d 638 (7th Cir. 2009).... 4

*Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183(5th Cir. 1977) ...................................... 14

Rules

Rule E of the Supplemental Admiralty Rules ............................................................. passim

## Introduction

**MAY IT PLEASE THE COURT:**

Pacific Sky Navigation Ltd. ("Pacific Sky"), solely as owner and claimant of the M/T PACIFIC SKY, subject to its restricted appearance pursuant to Rule E(8) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to the Federal Rules of Civil Procedure ("Supplemental Admiralty Rules"), files this Opposition to the Second Motion for Interlocutory Sale of Vessel [R. Doc. 37] filed by plaintiff, Nassau Maritime Holdings Designated Activity Company ("Nassau Maritime").

Pacific Sky acknowledges that despite its best efforts, it has not been able to obtain security for the vessel's release. But it is engaged in active commercial discussions with Nassau aimed at resolving this dispute and continues to believe a commercial resolution is not only possible, but in all parties' (including Nassau Maritime's) best interests. As such, Pacific Sky cannot help but view Nassau Maritime's renewed effort to deprive Pacific Sky of its vessel as a strong-arm tactic intended to take advantage of Pacific Sky in the ongoing commercial discussions.

Moreover, despite the passage of three months since the Court denied Nassau Maritime's first sale motion, Nassau Maritime still cannot carry its burden of proving the necessary critical elements to support an interlocutory sale of the M/T PACIFIC SKY (the "Vessel") under Rule E(9) of the Supplemental Admiralty Rules. Nassau Maritime has failed to prove that the Vessel is perishable or subject to deterioration, decay or injury. In fact, a joint survey confirmed that the Vessel is in good order and condition, and the Vessel has a full crew onboard properly maintaining it and protecting it from deterioration or damage. Notably, the Vessel withstood Hurricanes Laura and Delta unscathed, and the worst of the current hurricane season is over. Nor

has Nassau Maritime proven that the expense of maintaining the Vessel under arrest is excessive. In fact, these costs are manageable compared to the mortgage on this vessel, about $17.6 million, or the market value of the Vessel, which is at least $20 - 24 million and will increase in the foreseeable future as the global economy begins to emerge from the pandemic. And finally, Pacific Sky and Nassau Maritime are in active commercial discussions to resolve these claims, all during a global crisis that has profoundly impacted business activities worldwide, and an order to sell the Vessel could substantially disrupt those discussions. Nassau Maritime's Second Motion for Interlocutory Sale of Vessel should therefore be denied.

At a minimum, this Court should deny Nassau Maritime's request to credit bid its mortgage and should require it to pay cash in full if the M/T PACIFIC SKY is sold. Nassau Maritime seeks to enforce a foreign ship mortgage covering this and four other vessels through this arrest and the arrests of three other vessels in South Africa, Malaysia and China. The mortgage secures a loan that is governed by German law, and as explained in the attached Second Declaration of Dr. Ulrich H. Stahl, a German legal expert, Nassau Maritime's alleged acquisition of the loan was invalid under German law. Pacific Sky has filed proceedings in Hamburg, Germany against Nassau Maritime's contractual predecessor challenging the validity of the transfer to Nassau Maritime of the loan that underlies the mortgage, and those proceedings are ongoing. If this Court allows Nassau Maritime to credit bid its mortgage, Pacific Sky ultimately prevails in the German courts, and Nassau Maritime's claim here is denied, Pacific Sky will have lost its vessel with no sure recourse to recover its value.

In short, because Nassau Maritime's foreclosure claim is heavily disputed under the applicable substantive law, this Court should decline to sell the M/T PACIFIC SKY. But if nothing else, Nassau Maritime (or any other buyer) should be required to pay cash for the full

purchase price so that Pacific Sky can recover at least the sale proceeds if Nassau Maritime's

claim fails. For these reasons, as more fully explained below, Nassau Maritime's second motion

for interlocutory sale of the M/T PACIFIC SKY should be denied.

## Law and Argument

### I.     None of the Prerequisites Which Allow an Interlocutory Sale of a Vessel Are Present in This Case

Rule E(9)(a) of the Supplemental Admiralty Rules provides for the interlocutory sale of

seized property as follows:

> (i) On application of a party, the marshal, or other person having
> custody of the property, the court *may* order all or part of the
> property sold—with the sales proceeds, or as much of them as will
> satisfy the judgment, paid into court to await further orders of the
> court—if:
>
>> (A) the attached or arrested property is perishable,
>> or liable to deterioration, decay, or injury by being
>> detained in custody pending the action;
>>
>> (B) the expense of keeping the property is excessive
>> or disproportionate; or
>>
>> (C) there is an unreasonable delay in securing
>> release of the property.
>
> (ii) In the circumstances described in Rule E(9)(a)(i), the court, on
> motion by a defendant or a person filing a statement of interest or
> right under Rule C(6), may order that the property, rather than
> being sold, be delivered to the movant upon giving security under
> these rules. [Emphasis added.]

The movant has the burden of proof and must "demonstrate that at least one of the [three]

conditions listed in Rule E(9)(b) [now E(9)(a)] is present before the sale of the vessel will be

ordered." *Triton Container Int'l v. Baltic Shipping Co.*, 1995 U.S. Dist. LEXIS 4856, at *4 (E.D.

La. Apr. 11, 1995). But "[e]ven if they meet this burden, the Rule, by using the word 'may',

clearly indicates that ordering the sale is not mandatory." *Id.* As explained by the Seventh

Circuit, "[b]ecause the rule does not state any criteria to guide the judge … the judge can range widely in deciding what factors to consider … [I]n other words, [the judge] has considerable discretion." *United States v. Approximately 81,454 Cans of Baby Formula*, 560 F.3d 638, 641 (7th Cir. 2009) (affirming the district court's exercise of discretion in denying a motion for interlocutory sale under the identical wording of Supplemental Rule G).

Nassau Maritime cannot carry its burden of proving grounds for an interlocutory sale under Rule E(9), but in any event, this Court should decline to sell the M/T PACIFIC SKY at this time for equitable reasons.

### A.     The Vessel is not perishable, or liable to deterioration, decay, or injury.

Nassau Maritime has failed to show that the Vessel itself is perishable or subject to deterioration, decay or injury in any way. Nassau Maritime simply makes the unsupported and conclusory allegation that the vessel "requires regular maintenance of her hull and machinery," that "by sitting idle in the salt waters of the Gulf of Mexico, the Vessel is susceptible to decay and deterioration," and that "hurricane season is underway and has already placed the vessel at significant risk." [R. Doc. 37-1, p. 7]. But the Vessel has a full crew onboard performing all necessary maintenance and protecting the vessel from weather conditions and maritime perils.[1] In this regard, a joint inspection on 1 August 2020 confirmed the Vessel's good order and condition and the adequacy of her ongoing maintenance procedures.[2] And an additional third-party inspection could be arranged to verify that the Vessel remains in good order and condition and is not deteriorating.

Moreover, the Vessel withstood Hurricanes Laura and Delta unscathed, and although the worst of the hurricane season is behind us, the Vessel can again be moved to a safe location in

---

[1] Exhibit A, ¶¶10-11, Second Declaration of Mehmet Ali Umur.
[2] Exhibit B, pp. 52-53, Joint Inspection Survey dated 4 August 2020.

the extremely unlikely event that another hurricane threatens Lake Charles.[3] During Hurricane Laura, the Vessel proceeded to a safer location off the coast of Texas and promptly returned to the district. [R. Doc. 34]. Also, the parties are currently in active commercial discussions to resolve the underlying disputes in this matter and put the Vessel back into commercial use.[4]

An interlocutory sale cannot be ordered solely on speculation and conjecture. But that is all Nassau Maritime has offered here. Nassau Maritime has failed to offer any *evidence* that the Vessel is perishable or subject to deterioration or decay or injury as required by Rule E(9)(a)(i)(A). To the contrary, because the crew is still onboard, and a joint survey confirmed the Vessel's good order and condition and proper maintenance procedures, the opposite is true. As such, Nassau Maritime has failed to carry its burden of proving grounds for an interlocutory sale under Rule E(9)(a)(i)(A).

### B.      The expense of keeping the Vessel is not excessive or disproportionate when compared to the Vessel's value.

As it relates to Rule E(9)(a)(i)(B), Nassau Maritime bears the burden of proving that the cost of maintaining the Vessel under arrest is excessive or disproportionate. *Gyasi v. M/V "Andre"*, 2008 U.S. Dist. LEXIS 30279 (S.D. Fla. Apr. 1, 2008). Nassau Maritime has claimed $644,705 in *custodia legis* expenses since the arrest of the Vessel, consisting of substitute custodian charges, bunkers (marine gas oil), pilot fees, tug expenses, U.S. Marshal liability insurance, fresh water, garbage disposal, and local agent's fees. [R. Doc. 37-1, pp. 5-6]. Significantly, these are all expenses that have *already been incurred* and will not be reduced or avoided by an early sale of the Vessel. These are costs that are inherent in Nassau Maritime exercising the extraordinary remedy under the Supplemental Admiralty Rules of arresting the

---

[3] Exhibit A, ¶11.
[4] Exhibit A, ¶¶6-7.

Vessel.

Such past costs are not directly relevant to whether the Court should order an interlocutory sale under Rule E(9)(a)(i)(B). These past expenses do not and cannot support a finding that the costs to maintain the Vessel under arrest are excessive. As one court has stated:

> The plaintiff represents that it expended approximately $193,000 to have the Equipment removed from the vessel and placed in storage. Counting Marshal's fees and fees of the substitute custodian, the plaintiff states it has spent over $210,000 through December 31. Going forward (indeed, beginning September 2009), the monthly cost is a stable $5,092.
>
> The plaintiff does not explain the relevance of its sunk costs, incurred before it moved for interlocutory sale, in determining whether the expense is excessive or disproportionate. Certainly no order of sale can recoup the plaintiff's past expenditures. Absent authority or explanation, which the plaintiff does not provide, the _Court limits its consideration to the future expenses of keeping the property_.

_Adams Offshore, Ltd. v. Con-Dive, LLC_, 2010 U.S. Dist. LEXIS 7922, at *3-4 (S.D. Ala. Feb. 1, 2010) (emphasis added) (denying sale of a saturation and diving system).

Based on these historical expenses over six month, Nassau Maritime extrapolates that future expenses will be $100,000 per month to maintain the Vessel while under arrest. And with the ship's manager, Thome Ship Management ("Thome"), claiming $150,000 per month for crew wages, vendor fees, management fees, and other necessaries for the PACIFIC SKY while it remains under arrest, Nassau Maritime contends these combined expenses are excessive for keeping the Vessel.

Pacific Sky accepts that keeping the Vessel under arrest involves significant expense, but Nassau could have and should have expected those expenses when it had the Vessel arrested, along with three other Vessels under the same management. The PACIFIC SKY is one of five (5) vessels financed under the loan, and Nassau Maritime has arrested three of the other vessels

in Saldanha Bay, South Africa, Labuan, Malaysia, and Zhoushan, China.[5] Clearly, when it chose to detain almost the entire fleet that includes the PACIFIC SKY, Nassau was prepared to incur the significant costs that involved.

Nor can these continuing expenses be considered excessive in view of Nassau Maritime's claim, which totals more than US$124 million, or the Vessel's value. Pacific Sky disputes that Nassau Maritime has any valid claim under the loan agreement,[6] but the principal amount owed under the loan agreement solely for the PACIFIC SKY, if any, would be the balloon payment amount of US$17,642,090. Significantly, Pacific Sky would have refinanced that balloon payment and had a signed term sheet to refinance the PACIFIC SKY debt with Australis Maritime Limited,[7] but the lenders, Nassau Maritime's contractual predecessor, acting in bad faith, mislead Pacific Sky about the prospects of negotiating an early termination of the entire loan commitment (which covered five vessels) when they were actually in the process of selling the loan to a hedge fund (the present plaintiff), a critical fact they failed to disclose to Pacific Sky.[8] The lenders' failure to comply with their legal obligations to act in good faith toward Pacific Sky invalidates this plaintiff's claim as a matter of German law and is now the subject of ongoing litigation in Germany.[9]

Moreover, Pacific Sky estimates that the M/T PACIFIC SKY is presently worth at least US$20 – 24 million and will increase in the foreseeable future as the pandemic begins to subside.[10]

---

[5] Exhibit A, ¶3.
[6] Exhibit A, ¶9; *See* Exhibit C, Second Declaration of Dr. Ulrich H. Stahl; R. Doc 26-1, pp. 5-19, Declaration of Dr. Ulrich H. Stahl.
[7] Exhibit A, ¶4; Exhibit C, ¶35; R. Doc. 26-1, p. 7, ¶10.
[8] Exhibit C, ¶¶35-36, 56-66; R. Doc. 26-1, pp. 6-7, ¶¶7-15, pp. 14-16, ¶¶31-41.
[9] Exhibit C, ¶¶35-36, 75-70; R. Doc. 26-1, pp. 16-18, ¶¶42-45.
[10] Exhibit A, ¶5.

And Pacific Sky does not seek an indefinite delay. The parties are actively discussing a mutually beneficial commercial resolution and those discussions will either succeed or they won't. But either way, we should know by the end of 2020. The additional costs that will be needed to hold onto the Vessel until then are very limited, particularly compared to Nassau Maritime's total claims of more than US$124,000,000, its US$17.6 million claim against the M/T PACIFIC SKY, or that vessel's US$20 – 24 million current market value.[11] If, as Nassau Maritime claims, it will cost $250,000 per month to hold the Vessel going forward, the cost of holding the vessel for another three months represents less than 4% of the Vessel's value. This certainly is not a case where lienholders continue to incur *custodia legis* expenses "with uncertain hope of reimbursement." *Merchants Nat'l Bank of Mobile v. Dredge Gen. G.L. Gillespie,* 663 F.2d 1338, 1342 (5th Cir. 1981).

In short, the additional expenses Nassau Maritime will incur while the parties continue to pursue a commercial resolution are not excessive or disproportionate compared to the value of the vessel and the mortgage. Nassau Maritime has therefore failed to prove that the expense of keeping the Vessel warrants an interlocutory sale under Rule E(9)(a)(i)(B).

### C.      There has not been an unreasonable delay in securing the Vessel's release.

In a normal year a sixth-month delay in resolving a claim or securing a vessel's release might be considered unreasonable. But 2020 has been anything but a normal year. The Vessel was arrested on 3 April 2020, just after the start of the current global health and economic crisis. As the Court will appreciate, the uncertainties around the COVID-19 pandemic have made Pacific Sky's efforts to resolve this dispute with Nassau Maritime and/or obtain security for the Vessel's release extremely challenging. For example, the pandemic-related lockdowns closed

---

[11] Exhibit A, ¶¶3-5.

Pacific Sky's offices for an extended amount of time, and has significantly limited Pacific Sky's ability to travel to and meet in person with potential counterparties they have been in contact with around the world.[12] Given the amounts involved, there is simply no substitute for in-person contact with counterparties like Nassau Maritime and/or potential refinancers. While Nassau Maritime complains about the time it has had to hold onto the PACIFIC SKY, it necessarily accepted that risk when it decided to arrest that vessel, along with three other vessels under the same management, during a global health and economic crisis.

Notably, the cases that have found unreasonable delay almost universally found that another factor under Rule E(9)(i) also was present. *See Merchants Nat'l Bank v. Dredge Gen. G. L. Gillespie*, 663 F.2d 1338, 1342 (5th Cir. 1981); *John W. Stone Oil Distrib.*, *supra*; *Colonna's Shipyard, Inc. v. U.S.A.F. General Hoyt S. Vandenberg*, 584 F.Supp. 2d 862 (E.D. Va. 2008); *Ferrous Financial Services Co. v. O/S ARCTIC PRODUCER*, 567 F.Supp. 400 (W.D. Wa. 1983); *Neptune Orient Lines, Ltd. v. Halla Merchant Marine Co., Ltd.*, 1998 WL 128993, at \*6 (E.D. La 1998). In other words, delay is not unreasonable when, as here, the vessel is not deteriorating and the custodial costs are not excessive compared to the claim and the vessel's value.

And contrary to Nassau Maritime's contentions, this is not a case where the vessel owner is making no effort to secure the vessel's release. Although Pacific Sky has been unable to obtain security for the Vessel's release, the parties in this matter are currently in active commercial discussions to resolve the underlying disputes in this matter.[13] And Pacific Sky remains cautiously optimistic that the parties can resolve this matter amicably through a mutually

---

[12] Exhibit A, ¶8.
[13] Exhibit A, ¶6.

acceptable agreement.[14] This, too, supports denying Nassau Maritime's motion. *Boland Marine*, 2002 U.S. Dist. LEXIS 22737, at *6 (citing *Action Marine, Inc. v. M/V NORSEMAN*, 1997 U.S. Dist. LEXIS 5898, at *3 (E.D. La. Apr. 28, 1997)) and *Entron, Ltd. v. Crane Vessel Titan 2*, 1995 U.S. Lexis 6005, *8-9 (E.D. La. 1995)); *Merchants Nat. Bank of Mobile*, 663 F.2d at 1342 *Boland Marine & Mfg. Co. v. M/V A.G. Navajo*, 2002 U.S. Dist. LEXIS 22737, at *6-7 (E.D. La. Nov. 22, 2002); *Prosperity Bank v. Tom's Marine & Salvage, LLC,* 2020 U.S. Dist. LEXIS 26811, at *6 (E.D. La. Feb. 18, 2020).

Moreover, the global health and economic crisis continues to affect the global oil and shipping industries, which could negatively impact how much the M/T PACIFIC SKY will sell for at a judicial auction in the near future. As such, ordering the sale of the Vessel in the current economic crisis would be highly prejudicial to Pacific Sky. Because the M/T PACIFIC SKY's value is expected to increase in the foreseeable future, delaying ordering the sale of the vessel for a few more months should benefit all parties through a higher sale price.[15]

"A motion for interlocutory sale is not typically granted until enough time has passed to allow defendants to provide a bond to secure release of the vessel." *Bank of Rio Vista v. Vessel Captain Pete*, 2004 WL 2330704 (N.D. Ca. 2004). In this case, although more than six months have elapsed since the arrest, the world economy has been in an unprecedented (but now improving) crisis since before the arrest, and Pacific Sky is actively working, through the pandemic, to resolve the underlying dispute leading to this arrest. Under these circumstances, and considering that the Vessel is not deteriorating and the continuing costs for another few months are not excessive or disproportionate, there has been no unreasonable delay in securing the vessel's release that would justify an interlocutory sale of the M/T PACIFIC SKY.

---

[14] Exhibit A, ¶7.
[15] Exhibit A, ¶5.

\*          \*          \*

In sum, although additional time has passed since this Court denied Nassau Maritime's first sale motion, Nassau Maritime still cannot carry its burden of proving that an interlocutory sale of the M/T PACIFIC SKY is warranted under Rule E(9)(a)(i). This Court should therefore exercise its discretion and deny Nassau Maritime's interlocutory sale motion to give Pacific Sky more time to resolve this matter amicably through a mutually acceptable agreement.

## II.     Nassau Maritime Should Not be Permitted to Make a Credit Bid on the Vessel

Nassau Maritime also requests that, in connection with the sale of the Vessel, it be permitted to bid on credit up to the sum owed by Pacific Sky on the Preferred Ship Mortgage. Significantly, Nassau Maritime has no legal right to credit bid its mortgage. While "credit bidding is a recognized practice in the Fifth Circuit," *E.N. Bisso & Son, Inc. v. M/V Bouchard Girls*, 2020 U.S. Dist. LEXIS 156595, at \*10 (E.D. La. Aug. 28, 2020), it is entirely within the Court's discretion whether to allow Nassau Maritime to credit bid its mortgage here. *Coastal Marine Mgmt. v. M/V Sea Hunter (O.N. 598425)*, 274 F.Supp.3d 6, 8 (D. Mass. 2017) ("Pursuant to 46 U.S.C. § 31329(a)(2), a mortgagee of a vessel has a statutory right to participate in a court ordered sale of that vessel. There is no statutory right, however, to credit bid at such sale."). This Court should deny Nassau Maritime's request here.

As previously explained in connection with Nassau Maritime's first motion for interlocutory sale, there are very serious questions about the validity of Nassau's Maritime's claim, which are now the subject of ongoing litigation in Germany. As such, allowing Nassau Maritime to credit bid its mortgage would deprive Pacific Sky of its vessel without recourse in the event Nassau Maritime's claim is denied.

Pursuant to Clause 22 of the Loan Agreement, the Loan Agreement is governed by the law of Germany [R. Doc. 7-1, p, 45]. And there is a bona fide dispute regarding whether Nassau

Maritime has a valid claim to enforce the Loan Agreement as an assignee under German law.[16]

As noted in the Second Declaration of Dr. Ulrich H. Stahl, Pacific Sky has sued Nassau Maritime's contractual predecessor, Hamburg Commercial Bank (formerly known as HSH Nordbank AG) (hereafter "the bank"), in Hamburg, Germany. As Dr. Stahl explains, the bank assigned the relevant loan to Nassau Maritime's affiliate company, Promontoria Holding 260 B.V., which then immediately transferred the loan to Promontoria North Shipping Designated Activity Company, which transferred the underlying loan to the present plaintiff (then named Promontoria Maritime Holdings Designated Activity Company). As Dr. Stahl further explains, there was no valid transfer of rights regarding the Loan Agreement from the bank to the plaintiff, for multiple reasons; including that the loan could only be assigned to a syndicate, and no syndicate was formed, and due to section 399 of the German Civil Code, because the Loan Agreement implicitly prohibited assignment of the loan.[17] Dr. Stahl also explains that German law prohibits the novation of a contract (i.e., the transfer of both rights and obligations to a new contract partner) to the detriment of the other contractual partner without the consent of the other contractual partner.[18] Because the transfer of the loan to plaintiff was effectively a novation, although not styled as such, and the bank failed to obtain, or even request, Pacific Sky's consent to that novation, the transfer of the loan to plaintiff was null and void as a matter of German law.[19]

In addition, Pacific Sky believes there exists other grounds under German law precluding Nassau Maritime, as alleged assignee, from enforcing the default provisions of the Loan Agreement against Pacific Sky. Specifically, the bank mislead Pacific Sky about the prospects of

---

[16] Exhibit C; R. Doc. 26-1, pp. 5-19.
[17] Exhibit C, ¶¶8-37; R. Doc 26-1, pp. 7-12, ¶¶11-23.
[18] Exhibit C, ¶¶38-55; R. Doc. 26-1, pp. 13-15, ¶¶24-36.
[19] *Id.*

negotiating an early termination of the entire loan commitment (which covered five vessels). The bank also failed to disclose the critical fact that it was actually selling the loan to a hedge fund, the present plaintiff.[20] As a result, Pacific Sky put its efforts to refinance the loan on the PACIFIC SKY, which included a signed refinancing term sheet with Australis, on hold.[21] As explained by Dr. Stahl, the present plaintiff's rights as purchaser of the loan are nullified by its predecessor's misconduct as a matter of German law, which precludes Nassau Maritime from enforcing the Loan Agreement and the mortgage securing it.[22] Finally, the alleged assignment of the loan fails under German law because the underlying transaction between the bank and plaintiff's predecessor is void, as it contravened the rule against usury and is against public policy.[23]

Dr. Stahl also explains why the 10 June 2020 declaration of Nassau Maritime's German legal experts, Reed Smith LLP, is erroneous under German law on each of the above issues. Among other things, Reed Smith misconstrues who/what qualifies as "Syndicate Members" for an allowable assignment under the Loan Agreement.[24] In addition, Dr. Stahl explains how Reed Smith did not take the particular facts of the present case into account when disputing that the long-standing relationship between Mr. Ali Umur and HCOB was sufficient for the assignment of the loan to a hedge fund to change the content of the loan agreement so that the requirements of section 399 of the German Civil Code are not met.[25].

Of course, this Court need not resolve these obviously complex foreign law questions, at least not now. The point here is that Nassau Maritime's right to enforce the mortgage on the M/T

---

[20] Exhibit C, ¶¶35-36; R. Doc. 26-1, pp. 14-16, ¶¶31-39.
[21] Exhibit C, ¶¶35-36, 59-60, 63, 65-66, 68, 70; R. Doc. 26-1, pp. 6-7, ¶¶7-15.
[22] Exhibit C, ¶¶35-36, 56-70; R. Doc. 26-1, pp. 14-18, ¶¶31-45.
[23] Exhibit C, ¶¶71-76.
[24] Exhibit C, ¶¶18-24.
[25] Exhibit C, ¶¶28-37.

PACIFIC SKY is hotly disputed and is the subject of ongoing litigation in a foreign court.

This is significant because if Nassau Maritime is allowed to bid the full value of the Vessel without cash or cash equivalent, then Pacific Sky will be left without any recourse if it ultimately proves that Nassau Maritime had no rights under the Loan Agreement pursuant to German law. When a vessel is sold at an interlocutory sale, "the proceeds of sale shall be forthwith paid into the registry of the court to be disposed of according to law." Rule E(9)(b) of the Supplemental Admiralty Rules. The proceeds of the sale are in the registry of the court as a substitute for the *res* of the vessel. *Crabtree v. The SS Julia*, 290 F.2d 478, 481 (5th Cir. 1961). That is, at the end of this litigation, if Pacific Sky proves that Nassau Maritime's claim is invalid and obtains a judgment in its favor, Pacific Sky would be able to recover from the Court's registry the proceeds from the Vessel's sale, reduced only by *custodia legis* expenses and valid maritime liens. But if Nassau Maritime can take ownership of the Vessel without depositing cash in full, and it has no other significant assets (which is often true with hedge funds and their offspring, like Nassau Maritime), then Pacific Sky would be deprived of its Vessel without recourse, and without compensation. *See Silver Star Enters. v. M/V Saramacca*, 19 F.3d 1008, 1013 (5th Cir. 1994) ("[T]he sale order effectively terminate[s] [the vessel owner's] rights to title and possession of the [vessel]. … [T]he sale order affects rights that will be irretrievably lost in the absence of an immediate appeal.").

"The Fifth Circuit has approved of the district court imposing a requirement that a mortgagee bid cash." *Neptune Orient Lines v. Halla Merch. Marine Co.*, 1998 U.S. Dist. LEXIS 3745, at *17-18 (E.D. La. Mar. 19, 1998) (citing *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1187 (5th Cir. 1977)). In *Neptune Orient*, the court required the mortgagee to post bond and bid cash for *custodia legis* expenses:

> The court finds that the circumstances of this case warrant that Hanmi secure its credit bid with a bond. First, the court has recognized Hanmi's preferred mortgage on a[n] extremely expedited basis and in the face of vehement objection by other claimants who request additional time to develop the facts surrounding Hanmi's claim. Second, the stakes are high: the total claims well exceed eleven million dollars, and Halla is receiving authority to bid the value of its mortgage which value exceeds seventeen million dollars. In the unlikely event that Hanmi's mortgage is defective or denied priority, the bond provides some recourse for the other claimants. As to the cash requirement, Hanmi agreed at the hearing to pay cash up front for *custodia legis* expenses, crew expenses, and maritime liens which prime its claim.

*Id.* at *18-19.

Moreover, although there is relatively little guidance in the maritime caselaw as to when a creditor should and should not be allowed to credit bid its mortgage, the analogous bankruptcy caselaw has established that one basis for denying credit bidding in bankruptcy is if there is a genuine dispute over the validity of the claimed lien. *See*, *e.g.*, *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 61 (Bankr. D. Del. 2014) ("The law leaves no doubt that the holder of a valid lien of which has not yet been determined, as here, may not bid its lien."); *In re Merit Grp., Inc.*, 464 B.R. 240, 252 (Bankr. D.S.C. 2011); *In re Daufuskie Island Properties, LLC*, 441 B.R. 60, 63 (Bankr. D.S.C. 2010) (holding creditor not entitled to credit bid when its mortgage was in dispute); *In re Medical Software Sols.*, 286 B.R. 431, 442 (Bankr. D. Utah 2002) (noting proposition that credit bidding permitted only if creditor has a valid security interest); *Bank of Nova Scotia v. St. Croix Hotel Corp.*, 44 B.R. 277, 279 (Bankr. D.V.I. 1984) (only those with valid security interest can claim a setoff). Credit bidding has also been denied when doing so would chill cash bidding efforts or the creditor has engaged in inequitable or egregious conduct. *See*, *e.g.*, *In re Antaeus Technical Servs., Inc.*, 345 B.R. 556, 565 (Bankr. W.D.Va. 2005).

In *In re Fisker*, *supra*, the court held that a secured lender with a partially disputed claim would only be allowed to credit bid its claim in an amount equal to the purchase price it had paid. The court's ruling, which was upheld on appeal, was premised on the notion that limiting the secured lender's credit bid to the amount the creditor paid for the claim would lead to an active auction which was in the best interest of the debtor's estate and exemplified the "cause" necessary for the court to limit the creditor's right to credit bid its claim. The court noted that the creditor had "insisted on an unfair [sale] process i.e., a hurried process," and that the "validity of its secured status had not been determined." 510 B.R. at 61. However, the thrust of the court's ruling emphasized the effects of an uncapped credit bid on the auction process.

Similarly, in *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014), the court found that the creditor should have its credit bid restricted for three reasons: (1) the creditor did not have a valid lien on all of the property being sold, (2) the creditor had engaged in inequitable conduct, and (3) restricting the credit bid would "restore enthusiasm for the sale and foster a robust bidding process."

Again, Nassau Maritime has no right to credit bid its mortgage; that is entirely up to this Court's discretion. Here, Pacific Sky vigorously disputes the validity of Nassau Maritime's claim, for the reasons explained at length in Dr. Stahl's first declaration [Rec. Doc. 26-1, pp. 5-19] and his attached second declaration.[26] Not only was the assignment of the Loan Agreement invalid as a matter of German law, but the equities resulting from the original lender's bad faith invalidates this plaintiff's claim under German law. Requiring Nassau Maritime to bid cash or post a bond for the full value of the M/T PACIFIC SKY would provide Pacific Sky some recourse if, as Pacific Sky believes likely, Nassau Maritime's claim to the PACIFIC SKY fails

---

[26] Exhibit C.

16

under applicable German law. Nassau Maritime's request to credit bid its mortgage if the PACIFIC SKY is sold should therefore be denied.

## **Conclusion**

In sum, despite the passage of time since the Court first considered this issue, Nassau Maritime still cannot carry its burden of proving that an interlocutory sale of the Vessel is warranted under Supplemental Admiralty Rule E(9)(a)(i). Nassau Maritime has failed to show that the Vessel is perishable or at risk of deterioration, decay or injury during this arrest. To the contrary, the Vessel is in good order and conditions, employs appropriate maintenance procedures, and is presently at a safe and secure location near Lake Charles, with a crew onboard performing ordinary maintenance and protecting the Vessel from deterioration or damage. The Vessel has come through two major hurricanes unscathed, and the worst of the current hurricane season is over.

Nor has Nassau Maritime shown that future *custodia legis* costs will be excessive or disproportionate to the value of the claim asserted in this litigation or the value of the Vessel. The Vessel is worth far more than all potential *custodia legis* expenses, and it is uncontroverted that *custodia legis* costs can be satisfied with certainty if the Vessel has to be sold at some point in the future. Pacific Sky believes this matter can be resolved in the near future, and the costs of maintaining the arrest during the time needed to complete the current commercial discussions will be very limited compared to the plaintiff's claim and the Vessel's value.

Nor has Pacific Sky unreasonably delayed securing the Vessel's release. Normal considerations of what is reasonable delay are inapplicable in 2020, which has been extraordinary in multiple ways, but particularly the global pandemic's effect on international business negotiations and transactions. Despite the obstacles, the parties are in active commercial

discussions to resolve these claims. Given the current global health and economic crisis, Pacific Sky should not be penalized by the loss of its vessel because of its inability to resolve this matter as quickly as it might under normal circumstances.

Finally, if an interlocutory sale of the Vessel is allowed to proceed, Nassau Maritime should be required to bid and deposit cash for the full sale price of the M/T PACIFIC SKY to provide Pacific Sky recourse if, as Pacific Sky anticipates, Nassau Maritime's claim is held to be unenforceable under applicable German law.

For all these reasons, the Court should deny Nassau Maritime's Second Motion for Interlocutory Sale of Vessel [R. Doc. 37].

Respectfully Submitted,

MURPHY, ROGERS, SLOSS,
 GAMBEL & TOMPKINS

*/s/ Peter B. Sloss*
Peter B. Sloss (#17142)
psloss@mrsnola.com
Donald R. Wing (#29486)
dwing@mrsnola.com
701 Poydras St., Suite 400
New Orleans, LA 70139
Phone: 504.523.0400
Fax:  504.523.5574
***Attorneys for Pacific Sky Navigation Ltd.***

4826-6788-8335, v. 1